UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Mark Leslie,

      Plaintiff,

-v-                                 Case No. 2:04 -CV-0080
                                      JUDGE SMITH
                                      Magistrate Judge Kemp

Bruce Johnson, *et al.*,

      Defendants.

**OPINION AND ORDER**

      Plaintiff asserts that Defendants violated his First and Fourteenth Amendment rights

when they terminated his public employment for allegedly harassing a female co-worker.  Both

sides move for summary judgment.  For the reasons that follow, the Court grants Defendants'

Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment.

**I.  Facts**

**A.  Parties**

      Plaintiff Mark Leslie is an individual citizen of the State of Ohio.  Plaintiff worked as an

in-house attorney for the Ohio Department of Development ("ODOD").  ODOD terminated his

employment, effective March 1, 2002.

      Defendants are Bruce E. Johnson, ODOD's Director; Douglas A. Garver, ODOD's

former Assistant Director; Richard V. Everhart, ODOD's former Executive Director of the Ohio

Housing Finance Authority ("OHFA"); Marlo B. Tannous, ODOD's Chief Legal Counsel;

Heather L. Cunningham, ODOD's former Director of Human Resources; and Rita R. Parise,

1

OHFA's Director of Planning, Preservation.  All of the individuals are named in their individual capacities only. (Am. Compl. ¶¶ 6-11).

Plaintiff asserts a 42 U.S.C. § 1983 claim for violation of his First and Fourteenth Amendment rights, an O.R.C. § 4112 claim for religious discrimination and retaliation, and a claim for wrongful discharge.

### B.  State proceedings

After Plaintiff's employment with ODOD was terminated on March 1, 2002, he filed an appeal with the State Personnel Board of Review of Ohio ("SPBR"), claiming to have been fired for "whistle-blowing" activity under O.R.C. § 124.341.  (Am. Compl. ¶¶ 39, 45-47).  An oral evidentiary hearing was conducted by an Administrative Law Judge ("ALJ") of the SPBR on December 8-10, 29, 2003 and May 17-19, 2004.  Testimony and documentary evidence presented to the SPBR are part of the record in the instant case.  On May 9, 2005, the SPBR issued a decision upholding the ALJ's decision in favor of ODOD.  In its order the SPBR stated:

> Wherefore, it is hereby **ORDERED** that the instant appeal be **DISMISSED** principally for Appellant's failure to establish a *prima facie* case, pursuant to R.C. 124.03 and R.C. 124.341 and secondarily for Appellant's failure to rebut Appellee's demonstration that Appellant was, indeed, removed due to Appellent's creation and perpetuation of an untenable working environment for co-worker Karen Banyai and due to his insubordination in failing to cease and desist from these actions in the face of clear and repeated instructions to do so, pursuant to R.C. 124.03 and R.C. 124.341.

Finally, Leslie has filed a complaint with the Ohio Inspector General and a mandamus action in the Franklin County Court of Appeals, both of which have been dismissed. Am. Compl. ¶¶ 38, 40-44).  State ex rel. Leslie v. Ohio Housing Finance Agency, 2003-Ohio-6560, 2003 Ohio App. LEXIS 5856 (Franklin Dec. 9, 2003).  The Ohio Supreme Court affirmed the dismissal of Leslie's mandamus action, and further held that the attorney-client privilege applies

2

to communications between state agencies and their in-house counsel.  State ex rel. Leslie v. Ohio Housing Finance Agency, 105 Ohio St.3d 261, 824 N.E.2d 990 (2005).

### C. Employment history

Leslie began work for ODOD as "Chief of Compliance" on August 22, 2000, after having previously worked for thirty days as an intermittent employee.  Leslie's position was in the unclassified service.[1]  (Leslie Tr-3, 32; Am. Compl. ¶ 13).   Leslie began by assisting ODOD Chief Legal Counsel Marlo Tannous, but his job was quickly transposed to one providing legal services for the Ohio Housing Finance Authority ("OHFA").  For OHFA, Leslie became responsible for developing new loan documents, reviewing existing loan programs and closing loans. His position description, which stated that his job was to "provide a full range of legal advice and services to ODOD," was accurate. (Leslie Tr-2, 106-07; Tr-3, 46-47).

Throughout his career at ODOD, Leslie was directly supervised by and reported to Marlo Tannous, ODOD's Chief Legal Counsel and a Deputy Director. (Leslie Tr-2, 112-13; Tr-3, 39-41, 66).  He was indirectly supervised by Rita Parise. (Leslie Tr-3, 32-34; Appellant's Ex. 51). Among his peers was Karen Banyai, the Manager of OHFA's Housing Development Loan Program and Housing Development Assistance Program, where many of ODOD's loans were underwritten. (Leslie Tr-3, 60-62; Banyai Tr-6, 118).

While an intermittent employee, Leslie referred to Rita Parise of OHFA as "his client." (Leslie Tr-2, 110-11). On January 30, 2002, Leslie wrote, "If my attorney responsibilities run to the Board," then the OHFA board should have reviewed certain loan changes. (Leslie Tr-3, 54-

---

[1]  Unclassified employees have no tenure rights under Ohio law. See O.R.C. § 124.34; Christophel v. Kukulinsky, 61 F.3d 479 (6th Cir. 1995). "When a public employee has no property right in continued employment, the employee may be discharged without a hearing or notice." Curby v. Archon, 216 F.3d 549, 555 (6th Cir. 2000), citing Christophel 61 F.3d at 482, 485.

56; Appellant's Ex. 26 at ¶ 1). On March 22, 2002, Leslie wrote Michael Hardesty of the Attorney General's Office, "It was always clear that I was serving as an attorney for OHFA and ODOD" and referred to "my legal opinion as agency counsel." (Leslie Tr-3, 58-59; Appellee's Ex. 17). Leslie stated that his job was to "provide a full range of legal advice and services to ODOD." (Leslie Tr-3, 46-47; Appellant's Ex. 49). "I'm in the legal department. I'm around other attorneys. I am acting as an attorney would act." (Leslie Tr-3, 51-52).  He rendered numerous "opinions about legal issues." (Leslie Tr-3, 71-72).  Regardless of whether or not Plaintiff was an attorney for purposes of privileged communications, he was still performing the basic function of legal counsel for a state agency.

### D.  Karen Banyai

Leslie avers that his relationship with Karen Banyai was at first "professional" but "pretty casual." They called each other nicknames such as "Red Bear" and "Marvin the Martian," and Banyai shared some details about her family. (Leslie Tr-6, 30-31). Leslie was an "evangelical Christian," and thought Banyai was interested in his religious views. (Leslie Tr-6, 99-100). Although Banyai is a Christian as well, she recalls little religious discussion with Leslie and had formed few impressions of his beliefs. (Banyai Tr-6, 168-69).

According to Banyai, her working relationship with Leslie started out positive, but eventually became "challenging" in that she and Leslie wasted a lot of time trading e-mails in which Leslie used a great deal of technical jargon or legalese.  Banyai found such exchanges to be unproductive.  At other times, she believed Leslie was argumentative or uncooperative, creating a "challenging" work relationship. (Banyai Tr-6, 120-21, 162-68).  Banyai had just taken over a new program with new staff about the time Leslie was hired, so she needed to have

good relationships with her co-workers and keep the lines of communications open in order to meet her new responsibilities – and to avoid trading time-consuming e-mails with Leslie. (Banyai Tr-6, 128-29).

Near the end of May 2001, Leslie started to have marital difficulties, and on August 1, 2001, his wife moved out of their home.  On June 22, 2001, Leslie asked Banyai to accompany him to lunch at First Watch in Columbus, during which he told her of his impending divorce.  On the way back to the office, Leslie asked Banyai if he could see her socially.  According to Leslie, Banyai was "okay with just being – I think she used the term buddies," and otherwise wanted to think about it.  (Leslie Tr-6, 31-34; *see also,* Banyai Tr-6, 123-24).

The following weekend Leslie called Banyai at home to ask her to dinner at La Chatelaine in Worthington, Ohio, on Monday, June 25, 2001, when Banyai was not scheduled to work. Banyai viewed the occasion simply as two co-workers getting together, where each drove and paid separately.  (Banyai Tr-6, 124).  Leslie denies calling Banyai at home and says the dinner date had been arranged at work the preceding week. (Leslie Tr-6, 34).

At La Chatelaine, Leslie again proposed having a social relationship. Banyai responded that they might have lunch together occasionally, but that their relationship could progress no further because Leslie was amidst a divorce. (Banyai Tr-6, 124-25).  Leslie recalls having asked Banyai "who loves you?" at the La Chatelaine dinner, in connection with having discussed the Walk to Emmaus and the Kairos Ministry, two religious programs in which he was attempting to interest Banyai. (Leslie Tr-6, 33-37).  He denies that Banyai told him she was uncomfortable having a social relationship, and thought Banyai was "contemplating" one because she had not said "no" yet. (Leslie Tr-6, 38).

A week or so later, Leslie entered Banyai's office and again suggested a dating relationship. (Banyai Tr-6, 125-26).  A couple of days later, she told Leslie that a social relationship was not in the cards, that she did not date co-workers because of a prior bad experience, and she did not date people in the midst of divorces. (Banyai Tr-6, 126, 162).  Leslie protested that a divorce could take "years," but Banyai responded that they remained co-workers anyway, so that a dating relationship remained out of the question. (Banyai Tr-6, 127).

Leslie's recollection is similar, except  he conflates the two conversations into one. "But for these two facts [co-worker and divorce], she would have been interested in somebody like me because she had had the opportunity to get to know me through working with me." (Leslie Tr-6, 38-39).  Leslie's understanding was that the door was open to being "buddies" with Banyai, but not to dating. (Leslie Tr-6, 40).

Banyai testified that within a day or so Leslie asked her if she found him attractive. Banyai said she did not know him well enough to respond. Leslie proposed that they find a way for her to get to know him better. Banyai repeated that she did not date co-workers or recent divorcees. (Banyai Tr-6, 127). Leslie's recollection of this conversation is again different.  He recalls that he asked Banyai to "reconsider" her "policy," to which she replied, "are you final yet?" Leslie interpreted this to mean "when will you be available?" (Leslie Tr-6, 40-42).

On September 18, 2001, Leslie sent an e-mail to Banyai's home computer [Appellee's Exs. 11-12]:

> KB: I appreciated your sitting and talking with me today. (sic)Your haircut looks very cute (is that a permissible description for a "mature" woman when she looks nice). As you know, I am biased because I am attracted to you – even with your glasses on that keep sliding down your nose as you push back your thick brown tresses. It looks like your hair is getting darker … very nice.

6

As I know, you are very concerned about giving me any encouragement because of professional and emotional boundaries that you have established and expect me to respect. I admit that I am not doing a good job of respecting them.

Is there a middle ground? A set of circumstance where I can enjoy your companionship and begin to find out more about you without disrespecting your concerns and boundaries. I hope so.

I like your smile. I tease you so that I can see you smile – a sincere smile. I like your sincere warm smile … very much.

I would like to spend more time together to learn more about the non-professional Karen. Is there a warm, comfortable Karen who isn't focused on accomplishing something … A movie Karen … a fire in the chimney Karen … a cookout Karen … a walk in the park Karen … a ministry Karen … a Karen at worship … a campfire and s'mores Karen … a Karen who shares scripture and prayer … a small fellowship Karen … a Karen whose soul radiates a spirit-filled beauty that shines forth from her eyes, her smile, and her dimples?
That is a mystery that I would like to explore. I hope that will be possible soon. Any encouragement would be appreciated.

I hope you are taking care of your foot. Walks and talks on crisp autumn Sunday afternoons are good therapy for the soul … but not for injured feet.

Peace. Mark

(Appellee Ex. 9).  Banyai viewed the e-mail as "extremely personal," "inappropriate" and

"creepy." (Banyai, Tr-6, 130-31; Cunningham Tr-5, 51).  Leslie testified that the September 18,

2001 e-mail was meant to communicate his interest in getting to know Banyai on several levels,

"one of which could have led to a romantic relationship."  (Leslie Tr-6, 44-46; Appellee's Ex. 9).

Banyai did not respond to Leslie's message. (Leslie Tr-6, 46).


At about the same time, Banyai began to receive a number of calls at home from Leslie.

She started to screen her home calls and refused to answer if Leslie was the caller. (Banyai, Tr-6,

130-31). Leslie admits making several unanswered calls to Banyai's residence. (Leslie Tr-6, 42-

43).

On September 28, 2001, Leslie sent another e-mail to Banyai's home computer, which stated:

> Hi. Would you please loosen up the boundary just long enough to let me take you to dinner on your birthday?
> Please??

(Banyai Tr-6, 131; Leslie Tr-6, 55-56; Appellee's Ex. 10). In addition, Leslie left a phone message offering to take Banyai out to celebrate her birthday.  (Banyai Tr-6, 131).  Leslie also says he sent Banyai a birthday card offering to escort her to dinner on her birthday.  (Leslie Tr-6, 55-56).

Banyai was uncertain how to approach Leslie to tell him "no" any more directly than she had already done, because she did not want their work relationship to deteriorate. At work, Banyai was walking on "eggshells."  (Banyai Tr-6, 170-72).

Banyai did not believe she was encouraging Leslie's attentions.  (Banyai Tr-6, 133). Leslie understood that Banyai was not interested in "dating" but he did not consider a birthday dinner to be "dating." (Leslie Tr-6, 58).  Leslie appears to have drawn encouragement from the fact that Banyai merely ignored him, and never directly told Leslie to quit leaving unreturned messages for her at home. (Leslie Tr-6, 56-57). Banyai, on the other hand, recalls that the Monday after the birthday invitation, Leslie said he was getting a "very clear message" "personally" but inquired if he and she were "OK" "professionally." Banyai replied that their professional relationship was satisfactory.  (Banyai Tr-6, 133).

In early October 2001, Banyai was facing foot surgery.  Leslie offered to help Banyai get around after her surgery and run errands for her.  (Leslie Tr-6, 58-60; Banyai Tr-6, 134). Leslie

8

denies having prefaced his offer with "I know you're ignoring me and you really don't like me, but I'd like to help you anyway," but Banyai recalls such an introduction. (Leslie Tr-6, 60; Banyai Tr-6, 134). Leslie then he offered to help her Banyai's friend, Suzy Wilson, with whom Banyai had arranged her post-surgical care. Banyai refused this offer as well. (Leslie Tr-6, 58-60; Banyai Tr-6, 134).

Around this same time, Banyai and Leslie were having a disagreement at work. Parise told Banyai to go into Leslie's office, close the door and work it out. Banyai did not feel comfortable doing this, so Banyai told Parise about Leslie's unwelcome advances.  Parise offered to take action, but Banyai told her that she thought she had the situation under control. Parise told Banyai to come to her if there were further incidents and suggested that Banyai not interact with Leslie alone. (Banyai Tr-6, 135-36; Parise Tr-2, 93; Parise Tr-6, 184).

On Sunday, October 5, 2001, Columbus Day Weekend, Banyai was leaving her apartment complex with a friend when she believed she saw Leslie driving into the complex. Banyai returned home immediately to check her apartment for intruders. (Banyai Tr-6, 136-37).

Leslie admits he drove by Banyai's apartment. "It was a bad judgment on my part based upon basically just an impulse that I would go up and see if she would be willing to do one of those friendship activities by taking a walk" (Leslie Tr-6, 60-62). This was upsetting to Banyai because Leslie's unannounced arrival made her feel insecure in her home. She had thought that her professional relationship with Leslie was acceptable and that it was or should have been clear to Leslie that they were not going to have a social relationship. She had said "no" to dating, stopped returning his calls and did not return his e-mails. (Banyai Tr-6, 137-38).

The next working day, Tuesday, October 7, 2001, Banyai confronted Leslie and asked if

9

it had been him she had seen at her apartment complex. Leslie admitted driving by, saying that he wanted to invite Banyai to walk with Leslie and his dog "Katie" at Highbanks Metro Park. Banyai immediately went to Parise and told her it was time to take the next step. (Leslie Tr-6, 62-63; Banyai Tr-6, 138; Parise Tr-2, 94; Parise Tr-6, 186-87).

Later that same day, Parise summoned Leslie to a meeting with Tannous and Deputy Director of Human Resources Heather Cunningham. (Parise Tr-6, 187).  Tannous told Leslie that "no means no with respect to any kind of dating invitations" and "they talked about the fact that they didn't want me to have any kind of personal communication with Ms. Banyai." (Leslie Tr-6, 63-64; Parise Tr-2, 94). Parise and Cunningham told Leslie that "you don't call her, you don't e-mail her and you don't go to her house." (Parise Tr-6, 188; Cunningham Tr-5, 51, 58).  Leslie was "embarrassed" by his actions and said he understood their instructions. (Leslie Tr-6, 65; Parise Tr-2, 94; Parise Tr-6, 188). "At that point in time I felt that they told me not to do anything that was of a personal nature with Karen." (Leslie Tr-6, 65-66).

Later that day Leslie left a voice mail for Cunningham and Tannous apologizing for his inappropriate conduct and promising that it would never happen again. Cunningham took this message from Leslie to mean that he understood the boundaries established by ODOD regarding Leslie's future contact with Banyai. (Cunningham Tr-5, 97, 101).

Parise advised Banyai of their discussion with Leslie.  Everything seemed fine to Banyai for about a month afterwards.  She and Leslie might exchange passing questions such as "how was your weekend?" but beyond these commonplace superficialities, there were no real "personal" remarks or inquiries. (Banyai Tr-6, 139-40).

On re-direct examination, Leslie claimed that the conversation with Tannous, Parise and

10

Cunningham "created confusion in my mind," because he thought the direct order given to him was "tied to the event of pulling into the parking lot."  Leslie noted that "personal communications" was undefined.  Because Banyai shared the most superficial of one-line pleasantries with him at work, Leslie says he somehow interpreted "no personal communications" to mean it was permissible to telephone Banyai at home on family holidays. (Leslie Tr-6, 96-98). One such remark may have been to ask what Leslie was doing for Thanksgiving. (Leslie Tr-6, 66-67; Banyai Tr-6, 140).

On Thanksgiving Day,  Leslie phoned Banyai at home and asked if the call was overstepping his "boundaries." Banyai said yes and hung up.  (Leslie Tr-6, 67; Banyai Tr-6, 140, 175).  Leslie had just wanted "to talk" because his children had accompanied his ex-wife for the holiday, and Leslie was left at home alone.  (Leslie Tr-6, 67-68).

Banyai did not report this to Parise because she did not want to jeopardize her work relationship with Leslie. (Banyai Tr-6, 140-41, 175).  Leslie, however, volunteered to Parise that he had slipped up and telephoned Banyai at her home over the Thanksgiving weekend.  Leslie also mentioned his Thanksgiving contact with Banyai to Cunningham, who reminded Leslie once more that such contacts with Banyai were forbidden.  (Leslie Tr-6, 68-69, 103-04; Parise Tr-6, 190-91).

On  January 4, 2002, Leslie delivered copies of a *Columbus Dispatch* article about a prison outreach effort that provided Holiday cookies to prisoners.  One copy was intended for Parise, the other for Banyai.  Although he denies doing so, Leslie apparently placed Parise's copy in Banyai's box and vice versa.  (Leslie Tr-6, 71-73; Banyai Tr-6, 143-45; Parise Tr-6, 192; Appellee's Exs. 11-12).  The handwritten message at the bottom of the copy intended for Banyai

11

mentioned a religious program to teach computer skills to pre-release inmates. "What is needed is volunteers to teach.  Know anybody with a warm heart with computer skills they are willing to teach to others? If you do please have them contact me." [Appellee's Ex. 12].  Although he admits these articles were clearly not work-related, Leslie "didn't consider this to be dating.  I didn't consider this to be anything that even approached a personal relationship." (Leslie Tr-6, 71-73).

Parise did not object to religious nature of the article, but rather to Leslie's apparent disregard for management's instructions to leave Banyai alone. (Parise Tr-6, 195).  Parise thought the "warm heart" comment, along with the invitation to contact Leslie, clearly crossed the "line" because of their personal nature. She quickly instructed Leslie to stop these sorts of contacts. (Leslie Tr-6, 73-74; Banyai Tr-6, 145-46).  Parise warned Leslie that if he did something like this again, she would do something about it, meaning she would recommend disciplinary action. (Parise Tr-6, 195).

Between January 24, 2002, and February 4, 2002, within less than three weeks of Parise's warning, Leslie suddenly took it upon himself to "discover" and write memos about four new alleged violations of law in the way OHFA customarily did business. Many of these "violations" had happened months earlier, or had happened many times before. Leslie claims that "I didn't go looking for [violations] … I basically disclosed what I was … seeing in the course of working on loan transactions."  (Leslie Tr-3, 161-62).

Around Valentine's Day, Leslie asked Banyai if he might send her a religious Valentine. She said "no," and warned Leslie that such communications could get him in trouble.  (Banyai Tr-6, 146).  Leslie does not remember whether this incident occurred. (Leslie Tr-6, 76).

12

Within a couple of days, Leslie asked Banyai if she would go to lunch with him and another co-worker. Banyai again refused, and again cautioned Leslie that he was not to contact her on a social basis. Leslie asked Banyai to "think about it," but Banyai was not interested. (Banyai Tr-6, 146, 178).  Banyai did not know how to make it clearer to Leslie that she did not want to have anything to do with him on a personal basis. (Banyai Tr-6, 147).

Leslie *still* claims to have been confused as to what was required of him. All that he acknowledges he "understood was that Rita didn't like the reference to a person with a warm heart because there was still non-work related communication that would occur from time to time with Karen just in the course of interacting."  (Leslie Tr-6, 74-75).

Cunningham recalls having had three separate meetings with Leslie regarding his contacts with Banyai.  (Cunningham Tr-5, 51).

Shortly after Valentine's Day, Banyai received a telephone call at home from Leslie. Leslie claimed he wanted to discuss "projects" with Banyai. After Banyai objected to being called at home, Leslie asked to discuss these apparently urgent matters at work. Banyai, who was under the impression the projects must be work-related, agreed. (Banyai Tr-6, 147).  Leslie acknowledges that the call happened and that Banyai told him (again) not to call her at home, but claims he told Banyai that he had "personal information" for her.  (Leslie Tr-6, 78-79).  The point, apparently, is that irrespective of the instructions Leslie had received from Tannous, Parise and Cunningham, Banyai was otherwise permitted to undo this order by somehow "consenting" in some way to receiving "personal" information.

The following week, Leslie either handed Banyai a packet of information or left it in her mailbox. This included another invitation to participate in one of Leslie's religious projects by

13

providing computer support to "Bethlehem on Broad Street," and materials on how to create a will. (Banyai Tr-6, 148; Leslie Tr-6, 80; Appellee's Ex. 13). While admitting that these materials were not work-related, Leslie characterizes his telephone call and "gifts" to Banyai as "sort of an impulse decision on my part" and a "kind gesture."  (Leslie Tr-6, 80-81). But by this time the ever mounting non-work related communication from Leslie – religious or otherwise – was causing Banyai distress.  (Banyai Tr-6, 179).

Banayi found Leslie's behavior to be unsettling, worried about Leslie reappearing at her apartment, and did not want to answer her home telephone. Banyai did not want to be so confrontational with Leslie that it would ruin their work relationship and prevent her from obtaining legal advice necessary to move projects forward.  (Banyai Tr-6, 148-50).  Nonetheless, Banyai showed the materials to Parise.  (Parise Tr-6, 197). Banyai then met with Cunningham and told her that she was feeling intimidated by Leslie's continued advances to the point that she was on the verge of seeking a restraining order. (Cunningham Tr-5, 41).

Throughout this sorry tale, Leslie blames the "victim" for "encouraging" him by demonstrating even the slightest civility, from which he inferred ambiguity or even interest. "It gets a little blurry because … it's hard to understand if [Banyai] talks about things in the office [with others] in my presence and then … I provide her with information about things that don't really involve me" such as the will-making kit.  (Leslie Tr-6, 82).  Leslie claimed that what his managers had really prohibited was overtures about "dating or romance," not about other "personal" matters, and that "I could do some communication that was strictly on a friendship level that had nothing to do with romance [or] … dating, and basically involved … religious topics." (Leslie Tr-6, 81, 82-83). Leslie didn't think any of the directions he had been given

prohibited religious proselytizing "because I felt that that would have been illegal and I know that Marlo wouldn't have ordered me to do something illegal." (Leslie Tr-6, 115-16).

Leslie may or may not have been fixated upon Banyai's every action, but if he was "confused," it was only because he had ignored everything that Tannous, Parise and Cunningham had been telling him for almost five months. According to his *own* testimony:

- After his Columbus Day weekend visit to Banyai's apartment complex, Leslie was told to have no "personal communications" with her. (Leslie Tr-6, 63-64, 65-66);

- After Thanksgiving, Cunningham told Leslie that calling Banyai at home just to "talk" was inappropriate. (Leslie Tr-6, 68-69); and

- In early January, Parise told Leslie that strikingly similar "friendship" and "religious" overtures about a "warm heart" and prison ministries were highly inappropriate. (Leslie Tr-6, 73-74).

On February 19, 2002, Tannous, Parise and Cunningham met with Leslie and asked him two questions. Cunningham asked whether he had contacted Banyai at home over the weekend. Leslie admitted he had, but asserted he could properly do so because the call was not on working time. The second was whether Leslie gave Appellee's Ex. 13 to Banyai.  Again, Leslie admitted this was the case. (Leslie Tr-3, 163-64; Tannous Tr-4, 171; Parise Tr-6, 197).

Tannous and Cunningham then meet with Garver and Everhart, explained that Leslie had yet again disobeyed their clear directions to have no further non-work contact with Banyai. They considered ODOD's history of very low tolerance with this type of unwanted harassment and suggested that a recommendation be made to the Director that Leslie's employment be

terminated for insubordination and because of the potential liability for ODOD should Leslie persist in his unwelcome pursuit of Banyai. (Tannous Tr-4, 173, 175, 180; Garver Tr-7, 52). During this meeting, none of the participants discussed Leslie's criticisms or written memoranda criticizing OHFA's programs or business practices. (Tannous Tr-4, 175).

Cunningham, Tannous, and Garver then met with Director Bruce Johnson and made the consensus recommendation to the Director that Leslie be removed for insubordination. (Cunningham Tr-5, 48; Johnson Tr-6, 21). Director Johnson made the decision to terminate Leslie's employment based upon Leslie's insubordination and his continued unwelcome contact with Banyai. The Director was not even aware that Leslie had raised claims that some OHFA practices were illegal. (Johnson Tr-6, 21).

The next meeting, with Tannous, Cunningham, and Assistant Director Bruce Velt occurred on March 1, 2002. Leslie was offered the opportunity to resign in exchange for a two-week extension of his employment, but he declined.  (Cunningham Tr-5, 86-88; Leslie Tr-3, 31, 34-35; Tr-6, 85; Appellant's Ex. 56).  Cunningham told Leslie that "we have decided to go in a different direction." No other explanation was given. Leslie was then presented with a letter of removal.  (Leslie Tr-3, 28-30; Appellant's Ex. 57).

Leslie's harassment of Banyai did not end with his removal.  Incredibly, Leslie left voice mail and e-mail messages asking Banyai for a job reference – as if Banyai might be inclined to recommend his employment. He sent a bizarre and disturbing greeting card to Banyai's home "forgiving" her for a multitude of misdeeds for which Banyai undoubtedly did not feel in need of forgiveness, along with Kairos religious information.  (Leslie Tr-6, 85-89; Banyai Tr-6, 151-53; Appellee's Exs. 14, 14A).  Without her permission, Leslie gave Banyai's name as a "kind-

hearted person" (again) to the "Bethlehem on Broad Street Church," with which Leslie was affiliated but Banyai had no dealings, in the expectation that the church would contact Banyai – which it did.  (Leslie Tr-6, 90-91; Banyai Tr-6, 153-54; Appellee's Ex. 15).  Leslie transmitted a long series of unsolicited religious e-mails to Banyai at home.  (Leslie Tr-6, 89, 91-92; Banyai Tr-6, 154; Appellant's Exs. 61, 62, 63, 64).  Finally, Leslie sent Banyai an Easter card.  (Banyai Tr-6, 154-55; Appellee's Ex. 21).

Banyai did not respond to these communications in any way, except to report them to ODOD.  (Leslie Tr-6, 93).  She was extremely upset but the communications she had received after Leslie's termination, and was at a loss at how to get him to stop harassing her.  (Banyai Tr-6, 156).  She did not want a religious or any other kind of relationship with Leslie and thought she had made that clear. (Banyai Tr-6, 156).

Leslie claims he was still "confused" even after his termination.  (Leslie Tr-6, 94-95).  He thought Banyai had "acted in a way that resulted in my termination," but "I still was willing to consider her a person that I could relate to in Christ even though I wouldn't be relating to her in any other fashion." (Leslie Tr-6, 93).

### E. Leslie's Alleged Whistleblowing

Ohio Revised Code § 124.341, known as Ohio's whistleblower statute, contains a prohibition against taking disciplinary action against either a classified or unclassified employee for reporting violations of statutes, rules, or regulations, or the misuse of public resources which the employee has become aware of in the course of his employment.  Plaintiff claims that he blew the whistle concerning five areas of activities: 1) Equity Bridge loans; 2) the West Tech loan; 3) Seed Money loans to Victoria Place Limited Partnership; 4) the HOME Investment

17

Partnership Act loan to Woda Colonial Park; and 5) collateralization of a Compensating Balance loan in relation to Oak Hill Bank.[2]  Leslie asserts that Defendants terminated his employment in retaliation for five sets of memoranda he wrote regarding the aforementioned loan issues. Plaintiff prepared these memos in August and September 2000, and January and February 2002, questioning what he alleged to be wrongdoing at ODOD.  Plaintiff claims that he was fired in violation of his free speech rights under the First Amendment. (Am. Compl. ¶¶ 16, 20-24, 50).

Plaintiff filed the instant action on January 30, 2004, asserting that his discharge violated his First and Fourteenth Amendment rights to freely exercise his religion and freely associate with others.  Plaintiff also asserts an O.R.C. § 4112 claim for religious discrimination and retaliation, and a claim for wrongful discharge.  (Am. Compl. ¶¶ 19, 27, 33-35, 51-52).

## II.  Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is appropriate,

---

[2] Each of these alleged whistleblowing activities is discussed in detail in the ALJ's Report and Recommendation and adopted by the SPBR's Order.  The SPBR held that Plaintiff failed to establish a causal connection between his reporting and/or whistleblowing and his removal. The Court has found that collateral estoppel bars Plaintiff from raising those same claims again in this Court and therefore it is not necessary to address the details of these claims in this Order.

however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).[3]   The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. Id.  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. Id.

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479.

---

[3] Reeves involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56.  Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, Reeves, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001). As such, Reeves did not announce a new standard of review for summary judgment motions.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty Lobby, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  Id.  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"  Id. (quoting Matsushita, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  Id. at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

### III.  Discussion

### A.  Plaintiff's Free Speech/Whistleblower Claim

Defendants argue that Plaintiff's claim that he was terminated in violation of his free speech rights under the First and Fourteenth Amendment ("whistleblower claim") is barred by collateral estoppel.  Collateral estoppel "prevents a party from relitigating issues of fact or law which were necessarily decided by a previous final judgment."  Smith v. Sushka, 117 F.3d 965, 969 (6th Cir. 1997).  The Full Faith and Credit Clause requires that Ohio law be applied to determine the preclusive effect of the decision of an Ohio judicial or quasi-judicial body in a federal action.  Id.; Hapgood v. City of Warren, 127 F.3d 490, 493 (6th Cir. 1997).

Ohio law gives issue and claim preclusive effect to "those administrative proceedings

which are 'of a judicial nature and where the parties have had an ample opportunity to litigate the issues involved in the proceeding."  Set Products, Inc. v. Bainbridge Twp. Bd. of Zoning Appeals, 31 Ohio St.3d 260, 262 (1987).  Proceedings before the SPBR are manifestly quasi-judicial in nature, and the Sixth Circuit has given issue preclusive effect to the SPBR's resolution of factual disputes in Smith v. Sushka, 117 F.3d at 969.

According to the court in Smith, Ohio law requires that the "identical issue was actually litigated, directly determined, and essential to the judgment of the prior action.  Id. at 969.  The test set forth in Smith in determining the identity of issues involves:

> a consideration of the evidence presented in support of each: If the same facts or evidence would sustain both, the two actions are considered the same within the rule that the judgment in the former is a bar to the subsequent action.  If, however, the two actions rest upon different sets of facts, or if different proofs would be required to sustain the two actions, a judgment in one is no bar to the maintenance of the other....

Id., quoting Monahan v. Eagle Pitcher Indus., 21 Ohio App.3d 179 (1984).

While Plaintiff may actually be arguing two separate claims, one pursuant to O.R.C. § 124.341 and the other pursuant to 42 U.S.C. § 1983, each share the common element that the retaliatory action must have been motivated by Plaintiff's "whistle-blowing" speech.  The evidence Plaintiff used before the SPBR is the same evidence being set forth in this case.  Essentially the same record has been established before the SPBR and now before this Court, relying on the same testimony and exhibits.  The SPBR not only held that Plaintiff failed to establish a prima facie case pursuant to O.R.C. §§ 124.03 and 124.341, but that he was discharged for his harassment of Ms. Banyai despite repeated warnings to stop.  Therefore, Plaintiff is barred from relitigating the issue of whether his termination was the result of his "whistle-blowing" speech.

Collateral estoppel applies in this case to all Defendants, despite the fact that they were not all named in the proceeding before the SPBR.  The rule that mutuality of parties is a requisite to collateral estoppel is relaxed in appropriate cases.  Goodson v. McConough Power Equip., Inc., 2 Ohio St.3d 19 (1983).  The Goodson court explained that "under those facts where it was shown that the party defendant clearly had his day in court on the specific issue brought into litigation within the later proceeding, the nonparty plaintiff could rely upon the doctrine of collateral estoppel to preclude the relitigation of that specific issue."  Id. at 200-01.  Therefore, regardless of the parties named in each action or in what capacity they are named, Plaintiff had the opportunity to litigate the motivation of the ODOD, which includes the actions of the individuals making the determinations, and therefore is bound by the decision in the SPBR appeal.

Plaintiff argues that the decision of the SPBR cannot preclude him from raising the same issues before this Court because he has appealed the decision to the common pleas court and may further appeal to the state appellate courts.  Plaintiff asserts "[i]t is simply too soon for this Court to make procedural preclusions of the merits of Plaintiff's claims in this Action in reliance upon State administrative rulings that are subject to reversal by the common pleas court or the State appellate courts."  (Pl's Response to Defs' Supp. Mem. at 3).  While it is true that the SPBR's decision has been appealed and is subject to modification and/or reversal, that does not mean that issue preclusion is not applicable in this case.  The *Restatement of Judgments 2d* (1982), § 13, states:

> The rules of *res judicata* are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished form merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.

Defendants correctly point out that Ohio law on this point is sparse, but do direct the Court to

Wilkins v. Jakeway, 993 F.Supp. 635, 645-46 (S.D. Ohio 1998).  In Wilkins, the Court held that

a decision by another branch of the Court was preclusive as to a second action before the Court,

even though the appeal of the first action had not been resolved.  Id.  The Court therefore finds

that the decision by the administrative judge, which was ultimately affirmed by the SPBR is

sufficiently firm to be accorded conclusive effect in accordance with the aforementioned

Restatement.

　　　　Even if Plaintiff were not barred by collateral estoppel from asserting his claims relating

to the whistleblower issues, the speech contained in those memoranda would not be related to

matters of public concern and therefore would not constitute a constitutional violation.  Plaintiff,

in his memos, was merely raising general questions about the manner in which OHFA operated.

Plaintiff was merely expressing concern over documentation of a loan program and questioning

whether the Board was informed of a modification in another program.  In Rodgers v. Banks,

344 F.3d 587, 598 (6th Cir. 2003), the Court explained that while whether public offices are

operated in accordance with the law is generally a matter of public concern, not all statements

about office operations relate to matters of public concern under Connick.  Plaintiff's speech is

much like that in Thomson v. Scheid, 977 F.2d 1017 (6th Cir. 1992), in which a fraud

investigator's communications about whether fraud by another county official were to be

investigated were not protected.   The Court held the speech did not involve a matter of public

concern because his point was to merely raise questions about the procedure or manner in which

the investigation was to be conducted.  Id.  Plaintiff's speech in this case, therefore, does not

involve a matter of public concern.  Plaintiff does not assert that his employer is violating

specific laws, but he was merely expressing his concern over procedural matters.

## B. Plaintiff's Free Exercise of Religion Claim

Plaintiff alleges Defendants violated his First and Fourteenth Amendment rights when he was terminated. Defendants, however, argue that Plaintiff was not terminated for exercising constitutionally protected speech, but rather because he was harassing a female co-worker. Defendants also argue that they are entitled to qualified immunity.

The First Amendment provides as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I. Plaintiff contends that Defendants violated his right to free exercise of his religion, and his right to free speech.[4] Plaintiff and Defendants each argue that a different standard should govern the analysis of Plaintiff's claims. Plaintiff proposes that the standard set forth in Employment Division v. Smith, 494 U.S. 872 (1990), which involved a free exercise of religion claim where the government was acting as sovereign, should be applied in this case. Defendants, however, correctly argue that the standard set forth in Pickering v. Board of Education, 391 U.S. 563 (1968). The Pickering balancing test is applicable in this case because the government is acting as the employer and the government's interest in maintaining an efficient workplace exists regardless of whether the employee is trying to exercise his right to free speech or his right to the free exercise of religion. Therefore, considering the Pickering balancing test can and has been applied to any First Amendment claim, including a mixed claim

---

[4] Plaintiff has apparently abandoned his claim that Defendants violated his right to association.

of the right to free speech and free religious expression, the Court will apply the test to the case at bar.  *See* Collins v. Voinovich, 150 F.3d 575 (6th Cir. 1998); Monks v. Marlinga, 923 F.2d 423 (6th Cir. 1991); Cummings v. Kilroy, 908 F. Supp. 507 (S.D. Ohio 1995).

When a public employee, like the Plaintiff in this case, alleges that he was terminated for engaging in freedom of speech that is protected, the Court must consider three elements.  First, the speech must be constitutionally protected.  Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998). Speech is protected if it is on a subject of public concern.  Connick v. Myers, 461 U.S. 138, 143 (1983).  Second, the Court must decide whether the "interest of the employee as a citizen, in commenting on matters of public concern, outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees."  Pickering, 391 U.S. at 568. Third, the Court must consider whether there was an adverse action that constitutes an injury that would likely chill a person of ordinary firmness from engaging in the protected activity and whether plaintiff's speech was a substantial or motivating factor in the employer's adverse action.  Bloch, 156 F.3d at 678.

Plaintiff's speech and other communications in this case consisted of telephone calls to a co-worker, Ms. Banyai, both at work and at her home, leaving voicemail messages, sending her emails, leaving religious materials in her workplace mailbox, and visiting Ms. Banyai's home. Defendants seem to concede that Plaintiff's speech involved a matter of public concern in stating that "[a]lthough expressions of personal religious faith, or religious solicitations do not fit neatly under *Connick*, most courts assume *arguendo* that such expressions are of "public concern." Defs' Mot. for Summ. J. at 49.  In Knight v. State of Connecticut, Dep't of Public Health, 275 F.3d 156, 164 (2nd Cir. 2001), the Court stated that most cases involving expressions of religious

faith turn on whether the speech was disruptive under <u>Pickering</u>.

After finding that Plaintiff's speech involved a matter a public concern, the Court must now apply the <u>Pickering</u> balancing test to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer. 391 U.S. at 568. If the balancing test weighs in favor of Plaintiff, establishing that the his speech was protected, then the Court will turn to the final element.

While the <u>Pickering</u> court declined to "attempt to lay down a general standard against which all such statement may be judged," it has identified some factors that are indicative of a disruptive work environment and would justify a restriction on speech. <u>Id.</u> at 569. For example, courts should determine whether the speech tends to disrupt "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning," or whether the speech implicated the maintenance of "discipline by immediate supervisors...." <u>Id.</u> at 570. The Sixth Circuit has also set forth similar guidelines:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers.

<u>Brandenburg v. Housing Authority of Irvine</u>, 253 F.3d 891, 899 (6th Cir. 2001).

The Court in Waters v. Churchill, 511 U.S. 661, 673 (1994), gives deference to the employer's reasonable prediction of disruption, stating:

> [W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restriction on the speech of the public at large. Few of the examples we have discussed involved tangible, present interference with the

26

agency's operation.  The danger in them is mostly speculative.... [W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential.

Accordingly, "the government need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." Jackson v. Leighton, 168 F.3d 903, 910 (6th Cir. 1999).  "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to retrain her." Waters v. Churchill, 511 U.S. 661, 675 (1994).

Plaintiff, in this case, was hired and paid a salary to provide timely and accurate legal advice to ODOD.  However, over the course of Plaintiff's employment, he was warned repeatedly about his contact and actions toward his coworker, Ms. Banyai.  Considering the need for Plaintiff and Ms.  Banyai to work closely together and Plaintiff's failure to abide by his supervisors instructions, he was disrupting the office and ultimately the effective operation of ODOD.  Therefore, Defendants were justified in placing restrictions on Plaintiff's speech because of the disruption it caused.

Plaintiff argues that he could not have subjected Ms. Banyai to religious harassment since she claims to be a Christian too.  Not only is there no caselaw to support such an argument, but it ignores Ms. Banyai's testimony that the religious communications from Plaintiff were just as unwelcome as the romantic communications.  Applying the Pickering balancing test, Plaintiff's free speech interests do not outweigh the government's interest having an efficient workplace.

27

Plaintiff's interest in continuing to communicate with an unwilling listener, Ms. Banyai, about religious or mixed religious and romantic issues is limited at best.  However, Defendants' interest in preventing harassment of its employees is great.  Defendants are entitled to take action against harassment before it rises to a level that would be actionable by the victim.[5]

Even if the <u>Pickering</u> balancing test weighed in favor of Plaintiff, Plaintiff's alleged protected speech was not a substantial or motivating factor in his termination.  It is clear from the facts and Plaintiff's own admissions that he was harassing his co-worker, Ms. Banyai.  Despite being warned, Plaintiff's disruptive conduct continued and Defendants were forced to terminate Plaintiff's employment.   Therefore, Plaintiff was terminated because he was harassing a co-worker, not because he engaged in protected speech.  Further, Defendants' warnings to Plaintiff were just that, warnings to quit harassing Ms. Banyai.  ODOD essentially forbade Plaintiff from having any non-business-related contact with Ms. Banyai.  While Plaintiff may think this restriction was only applied to him, it was essentially ODOD enforcing its policy against harassment.  Defendants, therefore, were not placing any restrictions or limitations on Plaintiff's religious speech, but rather, his harassing speech and conduct.

### C.  Qualified Immunity

In addition to asserting that they did not violate any of Plaintiff's constitutional rights, the Defendants also assert that they are entitled to qualified immunity from Plaintiff's First Amendment claim because Plaintiff has failed to demonstrate a violation of clearly established law in her Complaint.  The doctrine of qualified immunity shields government officials from

---

[5] The standard set forth in Title VII cases is that the employer should act before the harassment becomes so severe and pervasive that it has actually altered the victim's working conditions.  <i>See</i> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 805-06 (1998).

liability, as well as from suit, as long as their official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To determine whether a state actor is entitled to qualified immunity, this Court must apply the following two-step analysis.  First, determine whether the plaintiff has demonstrated the violation of a constitutionally protected right. Second, examine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right."  Brennan v. Township of Northville, 78 F.3d 1152, 1154 (6th Cir. 1996).

**1.  Constitutional Violation**

The threshold question is whether plaintiff's allegations establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730 (2002).  Plaintiff has alleged that Defendants violated his right to free speech and the free exercise of religion under the First Amendment.  The Court, however, has already analyzed whether Plaintiff has sufficiently alleged that Defendants violated his constitutional rights above.  After concluding that Plaintiff has failed to allege a constitutional violation, Defendants are entitled to qualified immunity.

**2.  Clearly Established Constitutional Rights**

Even if Plaintiff were to have sufficiently alleged a constitutional violation, he could not prove that the violation was of a clearly established statutory or constitutional right.  Harlow, 457 U.S. at 818.  A right is clearly established if a reasonable official would understand that what he is doing violates that right.  Id.

Plaintiff cannot point to a decision that held that an employer was not justified in terminating an employee who was harassing another employee.  In fact, Plaintiff failed to cite

any relevant caselaw clearly establishing any of his theories or claims.  A reasonable government employer, like Defendants in this case, would have terminated an employee for harassing another employee to prevent any Title VII repercussions.  Therefore, Defendants are entitled to qualified immunity on Plaintiff's claims against them.

### D.  Plaintiff's Fourteenth Amendment Claim

Plaintiff's Fourteenth Amendment claim is predicated on his First Amendment claims. Even if Plaintiff had asserted separate constitutional claims in his Amended Complaint, he has failed to establish any constitutional violations committed by Defendants.  Therefore, Defendants are entitled to summary judgment on all Plaintiff's constitutional claims.

### E.  Plaintiff's State Law Claims

Plaintiff's initial complaint contained state law claims, however, they were omitted from his amended complaint.  Nonetheless, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims because it has granted Defendants' Motion for Summary Judgment on all Plaintiff's federal claims. It is well settled that a District Court may decline to exercise supplemental jurisdiction over statelaw claims once it has dismissed all claims over which it possessed original jurisdiction.  Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 233 (6th Cir. 1997).  Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed.  Id.; Taylor v. First of Am. Bank-Wayne, 973 F.2d 1284, 1287 (6th Cir. 1992).  Therefore, pursuant to 28 U.S.C. § 1367(c)(3) and (d), the Court will dismiss Plaintiff's state law claims against Defendants without prejudice.

### IV.  Disposition

Based on the above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 10); and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 30).

The Clerk shall enter final judgment in favor of Defendants, and against Plaintiff, dismissing this action in its entirety with prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

The Clerk shall remove Docs. 10 and 30 from the Court's pending motions list.

**IT IS SO ORDERED.**


**/s/ George C. Smith**
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**